The next case we have for today is case number 2020-30356, Adam Kokesh v. Kevin Curlee. Before you proceed, I just wanted to thank you on behalf of the court for your request to appear for argument here today. Today is the first time that we have been back in this courtroom, or in any courtroom here in our New Orleans courthouse, in almost a full year. And so we are trying to accommodate lawyers who request in-person arguments where we can. We're not able to honor all requests, but we're trying to accommodate where we can. And we're very pleased to try to do it in a very safe manner. As you know, you had a separate check-in time today. You were not set at 9 a.m. with a bunch of other lawyers and a bunch of other cases. We have these handy-dandy plexiglass dividers which separate us in the courtroom. We have our masks and other devices, and we obviously are very socially distanced on the bench and otherwise in this courtroom. So we're trying to do our very best to make this a safe experience for you. And if you have any suggestions for how we might make it even safer, we welcome those suggestions to the clerk's office. But just wanted to let you know that we're glad to be here with you here today and appreciate your request for a live oral argument. And we look forward to the arguments, and we'll hear the first argument at this time from Mr. Castaigne. Mr. Castaigne. Good afternoon, Your Honors, and may it please the Court. My name is Andre Charles Castaigne. I am an Assistant Attorney General for the State of Louisiana, and I represent Louisiana State Trooper Kevin Curley. And I'm here today to ask you to find that the trooper is entitled to qualified immunity and to dismiss the case against him. As I know the Court's aware, this is a qualified immunity appeal. And, you know, because we raised qualified immunity in our motion for summary judgment, the burden is on Mr. Kokesh to prove that under the clearly established law that the trooper's conduct was objectively unreasonable, which is a little different burden from the burden on his, I guess I'll call it a normal summary judgment. Is this a prolonging the detention, the prolonging the stop? Is that the only ground that we're dealing with of what would constitute unreasonableness? That's my understanding, Your Honor. So we're not dealing with whether or not asking for ID is itself whether or not the officer has the right or whether you have to give your ID. That's already been decided by, and that's not squarely raised by this appeal. Correct? I believe so, Your Honor. I think, and I don't want to put words in Mr. Kokesh's counsel's mouth, but my understanding is that it was asking for the ID after there was no longer a valid reason for the stop during the extension of the stop. So it's whether or not that was extending the stop. Yes, Your Honor. It's not vis-a-vis whether you can lawfully ask for ID or not. It's whether or not that unreasonably extended the stop. That is, yes, Your Honor, and that's the— And it, that's not, and there was nothing related to the videotaping that's an extension of the stop, right? I was trying to narrow what are the issues that actually are involved in the prolonging of the stop, the alleged prolonging. The stop was not prolonged merely in order to take the video. It was the body cam of the officer. He did not, there's no evidence in the record, there's no evidence on the, from what you see on the video from the body cam. No, but the fact that the other gentleman was videotaping the, or recording the power washing action. Oh, Mr. Kokash, you mean? Yes. But that's not the issue. It's not that, well, they should let him do his video. That's not the issue. It's whether or not the stop was prolonged unnecessarily beyond the time which the officer knew that everything was okay. Do you agree that everything was okay once the officer had been told that it was a power washing rather than a spray painting? Or do you maintain that even knowing that it was power washing, that doesn't mean it's okay? Well, Your Honor, and I would maybe push back a little bit that it was power washing. Mr. Ghisarelli said it was power washing. It's our power washer, we're here power washing. But certainly the officer had not had the opportunity to verify that or check that. He was still in the process of discussing with Mr. Ghisarelli what was going on. And he was in all of that process of obtaining the identification of the participants. And what's the total time period? I believe it's 14 minutes and a little bit, which is a little bit less than I have in my argument here today. And this is not a case where the officer had to call for the drug dogs and they had to wait 45 minutes or something like that. This is not any kind of case where the officer is doing anything other than trying to investigate what's going on at this unusual event, right? Yes, Your Honor. I think that's . . . You may proceed. I'm sorry I asked you quite a few questions. And I think that is what we get down to. Was it unreasonably prolonged? The trooper did not have to take Mr. Ghisarelli's word for what they were doing. And I think that the district judge's statement or statement from the record that she made and with respect to the district court is really pulled out of context. When it says, if you're doing this, then. Well, but if you were doing power washing, wouldn't that still be something to investigate? Because you're not . . . really random people don't do power washing of government property. I think there is certainly, under the totality of the circumstances, a reasonable suspicion that something unusual is going on. So the fact that somebody said, oh, we're just power washing, that doesn't assuage the necessity for the stop to continue, the investigation to continue? Not at all, because the officer . . . I mean, it's certainly not objectively unreasonable for the officer to want to continue looking into the situation. It's not objectively unreasonable for the officer to simply not take Mr. Ghisarelli's word for it and that that ends the constitutional validity of the seizure. Do we know if it's illegal or not to power wash government property without permission? I do not know that. I think you can make an argument that it potentially could fall under the criminal damage to property by graffiti. I think it does become a bit of a law school final question about what exactly is graffiti, but certainly, and I think the video shows that after Mr. Kokesh was arrested, when Trooper Curley went and took pictures and actually looked at the particular word freedom in the side, I think at least an objective observer looking at that video, I don't think it's particularly clear that that is, in fact, pressure washing with a stencil, even assuming that pressure washing with a stencil is okay. When the trooper first asked Mr. Kokesh, hey, let me see your ID, we agree it's all sort of unusual and strange. I think maybe it was your brief, you know, even by New Orleans standards, it was pretty strange. But at the time the trooper asked Kokesh for his ID, what criminal activity was potentially at issue then? I think defacing or vandalizing, not vandalizing, but the power washing itself. I think from the very beginning of the video, it shows Mr. Guzzarelli at the back of the pickup truck. Mr. Kokesh was at the passenger side door in the front seat of the double cab pickup truck. So you're saying at the time the trooper asked for the ID, he had not already established that they weren't spray painting or graffiti-ing. That was still up in the air? Yes, Your Honor, it was up in the air. I think at that point the officer had done a very brief flashlight into the bed of the truck, but he had not investigated the entire scene. And I don't think it's a meaningful distinction as to exactly what order he did it in. I think he had the right, once they were validly seized, to ask for the identification. And again, the burden is on Mr. Kokesh to show that it was objectively unreasonable under the clearly established law. The case law from this court is pretty clear that it's his burden. The case law is pretty clear that the district court has an obligation to point out that clearly established law. Again, with respect to the district court, I think the district court skipped over that step pretty broadly. Judge Lemon said there's no question the initial stop was valid, justified. That's beyond serious dispute. Judge Lemon just thought there were factual disputes about the remainder of the stop. But you're saying the facts really lead to one and only one conclusion. There aren't material, factional disputes that might foreclose summary judgment. Yes, Your Honor. I think for purposes of this qualified immunity appeal, any factual disputes, to the extent there really are any, are not material. And again, on a Fourth Amendment claim, even the constitutional violation itself, you have to look at whether it is objectively unreasonable or reasonable under the circumstances. And that video pretty much covers everything that happened. And since it's got to be from the point of view of the law enforcement officer who took the actions, it's what he saw. And I don't think Judge Lemon made any summary judgment findings that are different in a material way. He saw, the trooper saw what was going on. He saw, there's Mr. Ghisarelli. There is Mr. Kokesh. I mean, they might have been 12 feet apart. And the video shows after Mr. Kokesh was arrested when the trooper went up to the actual words in the side of the retaining wall. That was in between Mr. Kokesh and Mr. Ghisarelli. He certainly, it was certainly not objectively unreasonable for Trooper Curley to think that Mr. Kokesh had at least some connection. This was not like, I think it was the Johnson case, where Ms. Johnson had absolutely no connection with the reason for the traffic stop. And I think this court pointed out, there was no connection. Whereas in this situation, the trooper saw Mr. Kokesh pretty much right on the scene. I think if you, he was certainly a part and parcel of it. Even if he wasn't holding the pressure washer himself, he was there. There was further information from Mr. Ghisarelli and from Mr. Evans that this was part of an activity that they were all involved in. So I think that... But it's your position that at that time, at the time he requested ID, it was still unclear whether there was potential criminal activity having occurred or in the process of occurring, correct? Correct, sir. Correct, Your Honor. Is it safe to be parked in this, on this side of this, I guess it's the overpass. Is this a safe place to be parked or was that a problem too? I think that was certainly a factor. It was an unusual place. It was not a safe place. It was certainly illegal to park there. Well, at the time, I mean, did the individual show, say, oh, well, we're going to move along. We're not going to stay here. We're not going to do this. Or did they, I thought they were pretty much, we're going to stay here and do this because it's totally fine. They certainly, they certainly took the position that the activity with regard to the power washer was fine in the statements. Even with their vehicle parked where it was? Yes. I believe so. I mean, I think that's a fair interpretation of the record. I think they were certainly not, they were much more concerned, expressed much more about that the activity that they were doing was legal rather than the problems with pulling over on the side of the interstate at 1130 at night. But was the officer concerned about the placement of the vehicle or not really? I think he ultimately was because he told them they weren't supposed to be pulled over. He ultimately gave a ticket to the driver of the vehicle for parking on the side of the interstate. I think the cases that the district court cited, particularly the case the district court cited, Club Retro, in its rather short discussion of qualified immunity, certainly does not clearly establish the law in this situation. It was just so different. Swat raid, nightclub, 500 people going into a connected apartment where some people lived. So there were, that case just frankly does not set any, show any kind of clearly established law. Particularly in light of the Supreme Court's continued insistence that it has to be in the specific context of the case at hand. It's not as a broad general proposition. But just to be clear, Trooper Curley didn't just view what he was seeing as unusual. It wasn't just strange. It wasn't just weird. He thought there was potentially criminal activity happening? I believe so, Your Honor, because That the unusual circumstances were related to criminal activity. Yes, Your Honor, because certainly the record shows when he was asking about the spray paint, and if you're just power washing and not spray painting, that shows he was thinking about that. I think even his first, among his very first comments, when he got out of his unit and addressed them, it's like, hey, what are y'all doing? Are you spray painting? So he certainly had questions about that. He was, you know, unable to go, I'm saying my time's up. He was unable to go to the actual scene because he was busy trying to Can I have one more follow up, Your Honor, if you don't mind? But did the trooper never confirm that they in fact were not spray painting? Did he ever confirm in his mind that they were in fact not spray painting? I believe so because he inspected the scene. He inspected the power washer and the equipment. He was looking in the back of the truck. I think the video shows that he took a number of photos right up against where the And that happened before or after he requested the ID and all that? After he was able to complete that inspection. After he finally either got compliance or dealt with the identification issue. So he still had some inspection to do? Oh, yes, Your Honor. Separate and apart from the ID. Yeah, I mean, he still, he had not yet completed an inspection about what the activity with the lettering on the side of the retaining wall. Thank you, Counsel. Mr. Laughlin. Yes. Thank you, Your Honor. May it please the court. A lot of there are a lot of hard qualified immunity cases. But with the video recordings and this court's precedent, the Johnson case in particular, this case isn't one of the hard ones. The district court got it right. Mr. Curley or Trooper Curley's position is this situation was exotic. It was weird. It was strange. It was unusual. It was atypical. Well, not really. The pressure washer is a new one for me. But when Mr. Curley first gets to the car, he sees what he thinks is a broken down truck on the side of the road. He's there to render assistance. That's from his his initial report. And you agree that's a valid Terry stop, which is what the district court found. So we're OK at that point. Yes, that's we have no issue with that. As you as you explain, tell us the point. Not to interrupt your dialogue, but tell us when you get to the point where you think he has now departed from qualified immunity. Well, thank you. I'll do that. I think that's wise. Mr. Curley thinks he's going to render aid. Then he sees someone spray painting. He thinks that's Mr. Gizzarelli. Then it's valid for him to see what's what's going on. Are they defacing the property with paint? And I'm referring to page 10 of the appellee brief where we discuss what's on the video. He says it looks like y'all are spray painting. So it's not spray paint. That'll be fine. Mr. Gizzarelli told him, well, it's actually this pressure washer. It's just just water. We're just cleaning. So right after that, Mr. Curley, Trooper Curley goes up to the wall, shines his light. He checks it out. At that point, he knows it's only water. It's not paint. So he knows there's no crime. But does he know at that time that it's leaving a message on the wall? When you say, well, it's okay, officer. We're just pressure washing. At 1130, whatever time of night it is on the overpass, that's one thing. If they're pressure washing but designed to leave a message, is he aware on the video, is there any evidence, video or otherwise, that suggests that he's aware that they are pressure washing a stenciled message? He is well aware of that, Your Honor, because it's completely clear on the video. I think on the video. And there is a photograph, I assume Trooper Curley took, maybe another trooper. It's plain as day. I don't, as I stand here right now, remember whether Mr. Gizzarelli was mentioning, well, we're using the stencil. But I think he did on the video. So for purposes of summary judgment, Mr. Curley saw it. It says freedom. It's not, it's unambiguous. You can tell it's a word. And it's a word that's not written in paint. It's written in water. Mr. Kokesh and Mr. Gizzarelli did some research into the municipal code in New Orleans, Louisiana state law and said we can do this. We're not going to use chalk because somebody did that in the French Quarter and people got upset. We're certainly not going to use paint because we know that's a crime. But we're going to do this pressure washing thing with the stencil as part of our book campaign. So. Is it, well, they may have determined that that's totally fine. The officer hasn't done his research yet, because this is the first he's heard of such a thing, to decide whether it's totally fine or not. He has to check it out and see what kind of damage this may or may not be causing, doesn't he? And what is the message? Is it an appropriate message? You know, I know we don't want to be censoring speech or anything, but you can't put, you know, profanity up on the freeway, probably, even with the pressure washer, can you? It's certainly undesirable. Whether it's a crime, I don't know. The pressure washing by itself is not a crime. But how does he know that? He says it, Your Honor. He says it. If it's just water, it's going to be fine. If it's making a message, is it going to be fine? If it's making a message? A message. Because isn't that still graffiti, even if it's with the residue of the, it's like the mirror image of the dirt rather than the dirt itself. Why isn't that still graffiti? Well, I think that's what Mr. Castang was saying. Maybe that's some kind of law review or, you know, a philosophical question. What is graffiti versus what is art versus what is a message? Right. And we've got to deal with what is the officer on the scene on the fly who doesn't have the benefit of 25 con law books and the municipal code trying to figure this out, don't we? Well, I have the benefit of that, I think, and can't find that this is a crime. We're talking about this case. We're not talking about a vulgar message. We're not talking about drink Coca-Cola. We're talking about what happened in this case. No one's been charged with this. The one ticket was to the driver for stopping on the side of the road supposedly because he should not have. And that's not my battle to fight anyway. We don't care. Well, did they indicate they were going to leave right then before they got, because the citation for that came afterwards. So wouldn't the stop have to be extended long enough for the court to, I mean, the officer to give this, to take pictures of all the equipment and give the citation? But the video shows the stop was extended three or so minutes in. The stop is not about being parked on the shoulder. It's not about spray painting or not spray painting. That stop becomes about one thing and one thing only, whether Mr. Kokesh is going to give up an I.D. to Officer Curley. The first thing Officer Curley says after he's learned about the water, after he's looked at it, to Mr. Kokesh is, you got your I.D. on you, bro? Show me your I.D. Is this what you all do for fun? You videotape the police. That's the – he only approaches Mr. Kokesh to say that after he's learned that it's just water. And we know today that it's not illegal. I can't find a law against it. No one else can. Mr. Curley himself said, well, if it's just water, it's okay. But the stop from that moment on, from three or so minutes in, is all about demanding that Kokesh produce a document, produce an I.D., and then arresting him. So, Judge Elrod, I know you're saying this is a case about unreasonably prolonging a stop. Yes, it is that, but it's really – it's a false arrest case. It's not just the stop, which should have been three minutes, but instead it was 15 minutes, so now we're going to go file a lawsuit in federal court because it cost us a few minutes of our life. It's a false arrest case of Kokesh, and it's because Mr. Kokesh did not produce a documentary I.D. to Mr. Curley's satisfaction. And Mr. Curley can only demand that and impose a sanction for noncompliance if there is reasonable suspicion as to Mr. Kokesh. There is no argument, really, even that there was ever reasonable suspicion that Kokesh had committed a crime or was about to commit a crime. Mr. Curley rolls up on the car that stopped, don't have an issue with that. Mr. Curley sees what he thinks is somebody spray painting and defacing property, don't have an issue into looking into that. Don't have an issue with talking to Mr. Ghisarelli, checking it out for himself. But after that, it's all about Kokesh has to give me the I.D. or I will arrest Kokesh. And he knows Mr. Kokesh's name because the video shows the driver saying, what's his name? Adam Kokesh. Who? Kokesh? Yeah. K-O-K-E-S-H. Curley says, K-O-K-E-S-H. Yeah, right. He gets in his truck later on. He runs him through the computer. It's not that obvious, but it looks like that's exactly what he's doing. Was that okay for him to run the supposed name through his computer, which turns out to be the right name? Was that an unprolonging or inappropriate behavior? Only because that in and of itself is not an issue. But to the extent that the stop becomes about I want this person to give me an I.D. and I have no reasonable suspicion that this person has committed a crime, yes, that's unreasonable. But this person was involved in the efforts. This is not like Johnson, is it? Because Johnson is just the driver, isn't it, Johnson? He's the driver, and it's a driving the vehicle issue. Whereas this is a group enterprise of an artistic project that's unique. Well, at the time of the stop, it wasn't a group enterprise. It was Mr. Ghisarelli alone outside the car. He was the only one doing the pressure washing at the time Mr. Curley drove up on them. So it was a group enterprise as in that's what they were doing for a week or several days in New Orleans. But we hear about this one stop. Mr. Kokesh wasn't outside the car. Mr. Kokesh was simply a passenger in the car. There's no reasonable suspicion that Mr. Kokesh was committing a crime of any kind. The other gentleman didn't say Mr. Kokesh was involved and this whole thing was for Mr. Kokesh's benefit? He certainly said Mr. Kokesh is involved in the book campaign. It's his book. This is what we've been doing around town. He absolutely never said Mr. Kokesh and I were on the side of the interstate while traffic was at a crawl pressure washing the side of the road. There's no evidence of that whatsoever. Mr. Kokesh and that's why we say Johnston is not distinguishable in any important way. Mr. Kokesh is a passenger. The passenger in Johnston was a passenger. That was the role. And Mr. Curley. Was the passenger in Johnston directing the driver to do what the driver did? Is there any evidence of that? In Johnston I don't think there's any evidence. Frankly there's no evidence of that in this case. Well, it's for Mr. Kokesh's tour. This is for the benefit of Mr. Kokesh that this whole activity and enterprise is taking place, isn't it? Yes, that's true, Your Honor. But by the time we're getting into that inquiry, Trooper Curley has already determined there's no crime to begin with. So to say— See, that's the whole—that begs the question. The whole other side's brief says no, he hadn't determined that and that he wasn't sure whether or not. And that's why he then took pictures of all the equipment and stuff. Well, nothing followed from that. The rest of the 20 or 30 minutes or whatever it was on the video doesn't show it. It's not about some investigation into the pressure washer, let's look at the pressure washer, maybe take it into evidence, do this out of the other thing. It's all about, Kokesh, you need to give me your driver's license. Show me the ID. You like videotaping police, huh? That's what you do for kicks. Show me your ID. I'm going to find out your name. He already knows his name. He's already run his name. If you don't give it to me, I'm going to put you in irons. On that point, though, doesn't Mr. Ghisarelli, who I think is one of the gentlemen who was with in the vehicle or outside of the vehicle, doesn't the officer ask Mr. Ghisarelli, who is the driver? And he says, I don't know. He's a friend. I mean, would you concede that that's at least a suspicious answer to a normal person when you ask him, well, who's the driver, that you're traveling in a car with, and you don't know the name, but he's a friend. He's not a hitchhiker and a driver. He says he's a friend. I think that's a little unusual, whether it's suspicious enough  But even then, whether it's reasonable to find that suspicious, that doesn't matter to our case, I don't think, because by the time Mr. Kokesh is arrested and put in handcuffs, all of those suspicions have been dealt with. He knows the driver. It's Robert Evans. How does he know that, because of what the other person said? Because he talks to the driver. He talks to Ghisarelli. But does the officer have to accept a third person's representation as to the identity of someone in the vehicle? No, and in fact, he doesn't. So to me, the salient point in this case is at the moment of arrest, because the case is about a false arrest. So looking back from the moment of arrest to the inception of the stop, that's the more fruitful inquiry, rather than going from the beginning to the arrest. What does he know at the time of the arrest? At the time of the arrest, he knows all three of their names. He knows Kokesh's name. He's run Kokesh through the computer. He hasn't accepted anybody's word for anything. He knows what he thought was a car that needed help didn't need help. He knows what he thought was illegal graffiti and spray painting wasn't. Kokesh does present his ID before his arrest? Kokesh did not. You said he knew all three of them, and he put them through the computer. Again, my question is the only way he knows the name of the person is if he accepts on faith another third person's representation. Well, I don't think he accepted it on faith because he ran it through the computer. He ran through the computer the name that was given to him by someone else. Correct me if I'm factually wrong. No, I think that's factually correct. Okay, now let me get back, because I think we've hashed through a good bit of the blow-by-blow. Let me get back to my earlier question. Would you explain to us, pinpoint where the officer loses qualified immunity from the Terry stop up to the point? You've said the arrest was not valid, and that's part of your argument as far as a constitutional violation. Is that the only point that your case is based on? Is the false arrest, or is it based on something that happened in between the Terry stop and the arrest? Without the false arrest, there wouldn't be a case. It would be perhaps a technical intrusion that's not worth anybody's time. But you don't have any problem then with the officer shining the light in the car and saying you need to produce an ID? I don't have any problem with him asking the question. I mean, you can always demand things by consent. I have a problem with if you don't give me ID, I will put you in irons and take you to jail. That's what we've got a big issue with. So I think the point at which, and I think in my brief I talk about three minutes into it, he knows who everybody is, and he's verified for himself, Trooper Curley, that it's simply water. As things progress, he asks again for ID. Then he runs the name, Kokesh's name, through the computer. Well, again, I hate to beat a dead horse on this, but I'm trying to understand how he knows. You keep saying he knows who Kokesh is, but the only reason he knows that is because of what someone else has told him. The fact that he runs it through the computer doesn't confirm that the individual in the car is Adam Kokesh, correct? Possibly. Evidently it did. If you run it through the computer. If the person who was driving the car said that's, you know, Brian Johnson in the backseat, well, he would have run Brian Johnson's name in the computer, and what has come up would come up. But he doesn't know that that's Brian Johnson or Adam Kokesh. Frankly, he doesn't know when he gets an ID. I can say, well, here, Your Honor, here's my fake ID with my fake name on it. So he doesn't know then. That's a separate question of the validity of the ID. Right. So then how much intrusion are we going to sanction with either minimal reasonable suspicion at the outset, trickling down to no reasonable suspicion as to Kokesh? By the time he is arresting Kokesh, there was no reasonable suspicion that Kokesh had committed the crime, whether his name is Kokesh or Smith or Adams or whatever it might be. So I think a lot of these points that you're making, Your Honor, are reasonable points of discussion. But. Well, that's the purpose of oral argument. Yeah, exactly. I guess they should be. Discuss it and try to understand it better. But, yeah, there's always something more. You gave me your ID. Well, how do I know this is a good ID? Well, this ID expired two days ago. You got another ID? Well, I got a passport. What were you doing in Romania two weeks? Well, yeah, there's always something else that you can get that's more. But we're balancing the intrusion on individual liberty and on autonomy versus is there a crime committed here? And is this person committing the crime? So as Adam Kokesh's lawyer, I'm not that concerned about whether Mr. Ghisarelli committed a crime, whether the car is lawfully parked or not or stopped. There's no reasonable suspicion particularized as to Mr. Kokesh. Yes, they were all part of this book tour and promotion, but Kokesh is a passenger. He's just like the person in Johnston. There's no evidence that Kokesh said, oh, stop right here and let's do this. That's what they were doing generally. They were running around town doing this over a few day period. And he was directing it, right? Pardon? He was the one directing it. Well, I don't think he was, Your Honor. I mean, yes, it's his book. It's his project. It's probably his people that help him or they're volunteers or whatever. It doesn't matter, but they're his assistants in some way. Well, I don't want to nitpick, I guess, with you, but he's directing the larger project of the book promotion. He's trying to get the Libertarian nomination as president. He stands up for free speech. This is what he does. So, yes, he's directing it in some sense, but in terms of the activity we're talking about on this day, he's not directing that. They're all doing it because they know that's what they're doing, but he's not in charge of it. How does the officer know that until he's investigated what's going on? He doesn't, but then once he's investigated what's going on, he does. And the arrest of Mr. Kokesh comes after all of the investigation has happened. And another point is this isn't about tell me your name because that's the Hebel case and these other cases. It's about show me a document. It's not once on this video, and I looked at it I don't know how many times, where he says tell me what your name is. He says show me your I.D. You got a driver's license, bro. There's no obligation to have I.D., much less to give it up. You say the arrest came after the investigation. Opposing counsel says the arrest came sort of while the investigation was ongoing. And the record is what it is, and I guess I need to marinate in it a whole lot more. But you say definitively categorically the arrest, quote, the arrest came after the investigation, unquote. I wrote it down. He says no, no, no, the investigation was still underway when the arrest happened. So what's your best record evidence that the investigation had concluded? It's the video, Your Honor, and I can't point right now to the time stamp, but I think it's discussed pretty well in both briefs. When the arrest has happened, the investigation into anything Kokesh might have done that was a crime, or any crime in terms of the water, is over and done with. Trooper Curley is satisfied. He says he's satisfied. And, again, we're here on a summary judgment, so we're not here after trial on the merits, which Johnston was. Johnston was anyway. We're on a summary judgment where the facts are being construed in favor of Kokesh, the inferences from those facts. So at the point of the arrest, there are things that happen after that. There's, you know, here's your ticket, and let's take a picture of where the pressure washing was, and another officer arrives, so there's more that happens. People just don't leave, and the video ends. But I see I'm out of time, Your Honor, but I stand by that position. One last question. So you believe that the issue of qualified immunity would be something that the jury could be instructed on and would be on the jury verdict form, whether or not this officer enjoyed qualified immunity, correct? I believe that's a possibility under the pattern of jury instructions, although I don't like it. But I don't think on our record here today, on the summary judgment, there's not qualified immunity. Mr. Kokesh is a passenger. Well, right, but it doesn't preclude qualified immunity. Oh, no, no. We could be back here again after a trial or not. That's certainly a possibility. Yes, Your Honor. All right. Something that you have done here, and I want to make sure that that was your intention, is that you have narrowed the scope of what we're looking at compared to what was in the briefs. In the briefs, there was a lot of, well, was he being detained, and several times here you said, well, we're not here to quibble about whether it's 14 minutes or 12 minutes, you know, the time of the detention. What we're here about is the false arrest, is what you've said several times. So to the extent that the district court relied upon the prolonged detention as a basis for the case continuing, rather than for the false arrest, are you abandoning that argument, or do we need to decide the prolonged detention issue? Are you just here today to argue for false arrest and that that was wrong, or are you here to argue that the prolonged detention is the basis? I'm arguing both, Your Honor. I did not mean to abandon them. You want to do both. But I emphasize, from my standpoint, the case is about a false arrest. If the case was about I was detained for 20 minutes instead of 12 and a half minutes, call another lawyer with that case. Okay. Well, I'm just telling you that issue is here in these briefs before us. You say you conceded an oral argument that that's not what this case is about, and we don't have to deal with that except to vacate what the district court said on that point. I want to make sure that you meant to concede it and you didn't. I don't mean to concede it, Your Honor, because I think at a certain point the case, the detention is prolonged strictly to get I.D., and that's what Johnson and other cases say. You can't extend the detention just to get I.D. It's got to be something else. Okay. I appreciate you clarifying. I think that's important. Thank you, Your Honor. I'm sorry if I misled you. No, I appreciate it. Thank you. Again, Your Honor, I just want to add a couple of very quick points in the time I have. Can you talk about the false arrest in more detail? Because we were dealing with the prolonged detention during most of your argument. Alleged prolonged detention. I think I'm not sure. I don't know that there's a false arrest separate claim. The Judge Lemon's opinion talks about the first part of the seizure at the side of the road was legitimate, and then the prolonged detention is what became the problem. I have not read— Well, the issue is did Trooper Curley have probable cause to arrest Kokesh? And you have this—and you said it's an objective legal test and unrelated to Trooper Curley's subjective motivation. Can you tell us what the answer is? Did he have probable cause, and how do we know that? I think he had probable cause because under the circumstances when he first arrived at the scene, he saw Mr. Kokesh standing outside of the vehicle. That's not the question of what he did at the first— At the time he made the decision to arrest him, why was he arresting him? And was it based upon probable cause? He was arrested for violation of the obstruction of an officer's statute under Louisiana law, which requires that if you are validly seized, legitimately seized, that you have to provide your name, I think it's address, and what your activity is. And you have to provide that to the requesting law enforcement officer. And I think the video shows that that is clearly what happened. So long as the seizure was valid while it was going on. But the investigation was still ongoing. I think the record shows that the trooper had not completed a reasonable investigation into what that was on the side of the road. Also, even if he didn't give him a charge for that right then, there's nothing that says that the trooper has to give him— has to arrest him or charge him with a graffiti statute right then and there. As I think we've discussed a little bit, that statute may or may not cover the— cleaning the message into there. I think it certainly had communicative content, and I think at least a few of the dictionary definitions talk about communicative content as part of graffiti as opposed to just a vandalism. Graffiti has to be in the public view. There's nothing that—it is not objectively unreasonable for the trooper not to have relied solely on Mr. Ghisarelli's identification. I think as the court hypothetically pointed out, he could have said it was anybody running the ID. Well, yeah, we found a 40-year-old white male, 200 pounds. Yeah, it kind of might look like him, but that doesn't mean that it is him. The officer has the right to have the individual identify themselves, and I think the facts on the video show that it was reasonable to think that Mr. Kokesh had something to do with the power washing, message putting, whatever you want to call it, simply because he— or among other things, he was standing right there. It's not like Johnson where the individual was fortuitously a passenger in the vehicle that would not have been stopped but for the individual who was driving the car, had a warrant out for, and the officer who stopped the vehicle stopped it solely to execute that warrant. Additionally, with regard to Mr. Ghisarelli's comments, it's our power washing. It's we're doing this. This is a book tour that we're engaging in. Somebody else says he's a candidate for president of the United States. There are just a number of factors in that totality of the circumstances that would give him reasonable suspicion to take that next step. So with that, I would ask that you reverse the district court, find that Trooper Curley is entitled to qualified immunity, dismiss the claims against him. And I appreciate the court's attention. Thank you. Counsel, we appreciate your arguments here today. The case is submitted and the court will stand in recess until 3 o'clock when we consider the remaining case for the day. Thank you very much.